*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0269p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 04-5384

JOSEPH ARNOLD,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 03-20089—Jon Phipps McCalla, District Judge.

Submitted: March 9, 2005

Decided and Filed: June 21, 2005

Before: MOORE and SUTTON, Circuit Judges; CARMAN, Judge.[*]

———————————

## COUNSEL

**ON BRIEF:** Robert C. Brooks, Memphis, Tennessee, for Appellant. David N. Pritchard, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

CARMAN, J., delivered the opinion of the court, in which MOORE, J., joined. SUTTON, J. (pp. 12-22), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

CARMAN, Judge. On November 5, 2003, Defendant/Appellant, Joseph Arnold ("Arnold"), was convicted after a trial by jury in the United States District Court for the Western District of Tennessee of possession of a firearm by a convicted felon. Arnold appealed his conviction to this court. On appeal, Arnold argues that the District Court committed error in allowing the out-of-court statements of his accuser to be introduced during his trial, that the proof submitted to the jury was not constitutionally sufficient to sustain the guilty verdict, and that the court committed error in excluding a witness whom the defense sought to introduce to impeach the statements of the accuser. For the reasons stated herein, this Court **REVERSES** and **REMANDS** the case for entry of a judgment of acquittal.

———————————

[*]The Honorable Gregory W. Carman, United States Court of International Trade, sitting by designation.

1

BACKGROUND

At about 7:43 a.m. on September 19, 2002 (J.A. at 197), a woman called the 911 emergency telephone number in Memphis, Tennessee, to report that her mother's boyfriend – Arnold – had threatened her with a gun. At the end of the call, the caller identified herself as Tamica Gordon ("Gordon"). (Audio tape: 911 Recording (Sept. 19, 2002) (Ct. Ex. 9).) At approximately 8:00 a.m., local police officers were dispatched to a Memphis address and found a young woman upset to the point that she was having difficulty speaking. (J.A. at 112-113.) The officers later learned that the young woman's name was Tamica Gordon. (J.A. at 122.) Although no witness during the trial testified to such, the young woman the police met was apparently also the same woman who made the 911 call.

Gordon told the officers that Arnold "pulled a gun on her" and threatened to kill her. (J.A. at 114.) Gordon described the gun as a "black handgun." (J.A. at 127.) She did not indicate that the gun had any special characteristics. (J.A. at 151.) Based on Gordon's hand gestures, the officers inferred that she was describing a semiautomatic weapon. (J.A. at. 127.)

During a brief conversation,[1] Gordon began to calm. (J.A. at 115.) A short time after the officers arrived, a car pulled up to the address where Gordon and officers were conversing. (*Id.*) A woman was driving the car, and a man was in the passenger seat. (J.A. at 116.) As the car pulled up, Gordon became excited again. (J.A. at 115.) She pointed at the car and told the officers that the man in it was the same man who had pointed a gun at her. (*Id.*) According to one responding officer's testimony, Gordon said, "[T]hat's him, that's the guy that pulled the gun on me, Joseph Arnold, that's him." (*Id.*)

The officers "went to the car, asked [Arnold] to step out and patted him down for weapons." (J.A. at 117.) No weapons were found. (*Id.*) Arnold was cooperative and did not attempt to elude the police or run away. (J.A. at 126.) The officers then asked for and received consent from the car's owner (Gordon's mother) to search the automobile. (J.A. at 117, 129.) Under the passenger seat of the automobile, the officers found a loaded, black, semiautomatic handgun with a bullet in the chamber. (J.A. at 118-19.) The gun was in a clear plastic bag when the police located it. (J.A. at 142.) There were no fingerprints on the gun, and it was not stolen. (J.A. at 130-31.) The prosecution submitted no evidence that the gun belonged to Arnold, and Arnold did not admit that the gun was his. (J.A. at 131).

The government subpoenaed Gordon for the trial, but she did not appear. (J.A. at 28-29.) The District Court issued a warrant for Gordon's arrest, but she could not be produced before or during the trial.

The government moved at trial to introduce a tape of the 911 call alleged to have been made by Gordon and statements she later made to the police at the scene of Arnold's arrest. (J.A. at 38-39.) The government argued that the 911 tape was admissible under two exceptions to the hearsay rule: excited utterance and present sense impression. (J.A. at 38.) The government argued that Gordon's statements to the police were admissible as excited utterances. (J.A. at 39.)

After a hearing out of the presence of the jury, the District Court ruled that a redacted 911 tape was admissible as an excited utterance (J.A. at 64-65) but not as a present sense impression (J.A. at 63). The District Court also ruled that Gordon's statements to the police at the scene of Arnold's arrest were admissible as excited utterances. (J.A. at 78-79.) In issuing his ruling, the

---

[1]The initial conversation between the officers and the young woman apparently lasted between thirty seconds (J.A. at 115) and five minutes (J.A. at 146).

District judge stated, "[i]t would not upset me if the Court of Appeals overturned this determination, it wouldn't bother me." (J.A. at 80.)

## STANDARDS OF REVIEW

All evidentiary rulings, including those that challenge constitutionality, are reviewed by the appellate court under the "abuse of discretion" standard. *U.S. v. Schreane*, 331 F.3d 548, 564 (2003), *cert. denied*, 540 U.S. 973, 124 S. Ct. 448, 157 L. Ed. 2d 323 (2003). *See also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ("We have held that abuse of discretion is the proper standard of review of a district court's evidentiary rulings."). This Court will find an abuse of discretion when there is a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Schreane*, 331 F.3d at 564 (quoting *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 740 (6th Cir. 1999)). Abuse of discretion also results when the "lower court relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *U.S. v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003) (quotation and citation omitted).

As to Arnold's contention that the proof submitted to the jury was not constitutionally sufficient to sustain a guilty verdict, this Court must assess "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *U.S. v. Samuels*, 308 F.3d 662, 666 (6th Cir. 2002), *cert. denied*, 537 U.S. 1225, 123 S. Ct. 1335, 154 L. Ed. 2d 1085 (2003) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). On appeal, the court must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318. In assessing the sufficiency of the evidence, the court does not substitute its judgment for that of the jury and draws inferences in favor of the jury's verdict. *Salgado*, 250 F.3d at 446. Nonetheless, there must be "substantial evidence"[2] of the elements of the crime upon which the jury could determine the defendant's guilt beyond a reasonable doubt. *Burks v. U.S.*, 437 U.S. 1, 17, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978); *U.S. v. Orrico*, 599 F.2d 113, 117 (6th Cir. 1979). If this Court finds that the evidence was insufficient to sustain a defendant's conviction, the case must be reversed with direction to the lower court to enter judgment of acquittal. *Burks*, 437 U.S. at 18.[3]

## DISCUSSION

On appeal, Arnold asserts that his conviction should be overturned for any, or in the combination, of three errors that occurred at trial:

1.     The out-of-court statements of Gordon were erroneously admitted;

2.     The proof offered was constitutionally insufficient to sustain a conviction; and

3.     Defense counsel should have been permitted to present an impeachment witness.

(Arnold Br. at ii.) Each of these arguments will be examined in turn.

---

[2] Substantial evidence is greater than a "mere scintilla." *U.S. v. Orrico*, 599 F.2d 113, 117 (6th Cir. 1979). "It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *Id.*

[3] The "Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient." *Burks*, 437 U.S. at 18. Hence, judgment of acquittal must be entered if the evidence is legally insufficient. *Id.*

I.     *Gordon's Out-Of-Court Statements Were Erroneously Admitted.*

The District Court admitted three out-of-court statements into evidence under the excited utterance exception to the hearsay rule:

1.     A tape recording of the 911 call;

2.     The statements Gordon made to police officers upon their arrival; and

3.     The statements Gordon made to police officers when Arnold arrived.

For the reasons that follow, this Court finds that none of the statements was admissible as a matter of law.

A.     The spontaneity required to admit the 911 call as an excited utterance was not proved.

The District Court admitted the 911 call under the "excited utterance" exception to the hearsay rule. Fed. R. Evid. 803(2). An "excited utterance" is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.*

> The basis for the "excited utterance" exception, for example, is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous.

*Idaho v. Wright*, 497 U.S. 805, 820, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990).

In order for a statement to be admitted as an "excited utterance," three elements must be satisfied:

1.     There must be an event startling enough to cause nervous excitement;

2.     The statement must be made before there is time to contrive or misrepresent; and

3.     The statement must be made while the person is under the stress of the excitement caused by the event.

*Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983), *cert. denied*, 464 U.S. 1071, 104 S. Ct. 980, 79 L. Ed. 217 (1984). This Court has previously recognized that "the length of time between the event and the statement" is a critical – if not the most important – factor in determining whether the statement was spontaneous. *Id.* at 1057-1058.

This Court does not suggest that the 911 call did not relate to an event startling enough to cause nervous excitement. Further, we do not doubt that the caller – presumably Gordon[4] – was upset when the call was made. Nevertheless, the record reveals no evidence as to when the alleged incident between Gordon and Arnold occurred. The District Court acknowledged as much. (J.A. at 56 ("I don't know the time frame.").) Consequently, the District Court lacked *any* evidence with

---

[4]This Court also notes that the 911 tape appears to have been admitted lacking proper foundation. Not one witness at Arnold's trial confirmed that Gordon was the female whose voice is heard on the tape of the 911 call. Fed. R. Evid. 901(b)(5).

which to determine whether the 911 call was made before there was time to contrive or misrepresent. Without such evidence, a finding that the 911 call satisfied the spontaneity element for it to be considered an "excited utterance" was pure supposition.[5]  The District Court could not have known and did not know that there was sufficient assurance that the content of the 911 call was trustworthy and that cross-examination would be superfluous. *Wright*, 497 U.S. at 820.

The Confrontation Clause provides that in all criminal prosecutions, the accused has the right to be confronted with the witnesses against him. U.S. Const. amend. VI. Cross-examination has been recognized as the "greatest legal engine ever invented for the discovery of truth." *White v. Illinois*, 502 U.S. 346, 356, 112 S. Ct. 736, 116 L. Ed 2d 848 (1992). Because exceptions to the hearsay rule may not be permitted to supercede a defendant's right to confront his accuser as guaranteed by the Sixth Amendment of the United States Constitution, use of the exceptions must be closely scrutinized. Without proof of spontaneity, there can be no assurance that the statements were not contrived and did not misrepresent the situation.

This Court finds that the District Court erred in determining that the 911 call was spontaneous. Therefore, the 911 call was not – as a matter of law – an excited utterance and, thus, was inadmissible hearsay.

> B.       Gordon's initial statements to the police lack the spontaneity required to be considered excited utterances.

For the same reasons that the 911 call could not be considered an excited utterance, Gordon's initial statement to the police cannot be considered excited utterances. *See* Section I.A., *supra*. In the initial statement, which began approximately fifteen minutes after the 911 call, Gordon seemed to reiterate the substance of the 911 call. Again, the record reveals that Gordon did not provide any information to the police about when the alleged incident with Arnold occurred. Despite her excited state during the interview by the police, the District Court was completely without evidence concerning the time that elapsed between the alleged event and the statements being made. Thus,

---

[5]The dissent makes much of the 911 caller's excited state during the call as evidence that the call was made close in time to the alleged threat. For support of this proposition, the dissent quotes a lengthy paragraph from the *Haggins* opinion. (*Haggins* involved the admissibility of statements made by a four-year-old child after an alleged forcible rape. 715 F.2d 1050.) The majority does not read *Haggins* in the same light as the dissent. In fact, the language following that quoted and emphasized by the dissent only proves the importance of the lapse of time in a determining whether a statement is an excited utterance: "It is important to remember, however, that 'the *ultimate question* is whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event.'" *Haggins*, 715 F.2d at 1058 (citation omitted) (emphasis added). The District Court in the present matter had no means by which to answer the "ultimate question." The District Court could not overcome the spontaneity element of the excited utterance analysis because it had *no* evidence upon which to conclude that the caller had no time to reflect or contrive.

    The dissent also cited several cases in which courts have found that quite a long period (hours as opposed to moments) of time may pass between the startling event and an excited utterance. The majority notes that the "time lapse in most excited utterance cases is usually a few seconds or a few minutes." *U.S. v. Taveras*, 380 F.3d 532, 537 (1st Cir. 2004) (citations omitted). The *Taveras* court referred to longer lapses, like those found *U.S. v. Cruz*, 156 F.3d 22 (1st Cir. 1998), a case cited by the dissent, as "extreme circumstances." *Id.*

    In principle, the majority does not take issue with the cases cited by the dissent. However, those cases are readily distinguishable from the facts of this case. In all cases cited by the dissent, the trial courts had explicit evidence of the time that elapsed between the startling event and the statement. The amount of lapsed time together with other factors allowed the courts to determine whether the person making the statement was still under the stress of the event. The District Court in the present matter had no such evidence upon which to determine whether the 911 caller remained under the stress of the alleged event and whether she had time to contrive or misrepresent.

    A record to support the finding of an excited utterance may be "less than perfect" (J.A. at 64), but it cannot be devoid of evidence concerning the time that elapsed between the alleged startling event and the statement offered as the excited utterance. In the present matter, the District Court lacked the evidence to conclude that the 911 call was made before the caller had an opportunity to contrive or misrepresent. Therefore, the call cannot be considered an excited utterance.

the District Court erred in concluding that Gordon's initial statements to the police were excited utterances.

        C.      Gordon's statements when Arnold arrived appear to satisfy the excited utterance criteria.

When Arnold arrived at the scene of his arrest and in the presence of Gordon and the police, Gordon became excited and identified him to the police as the man who had threatened her. These statements appear to satisfy the criteria for the District Court to have considered them excited utterances. The arrival of Arnold may have been an event startling enough to cause nervous excitement. Having been made within moments of Arnold's arrival, Gordon's statements identifying Arnold to the police were made before she had time to contrive or misrepresent. Based upon Gordon's state when the statements were made, the District Court could conclude that she was still under the stress of the startling event when the statements identifying Arnold to the police were made. Nevertheless, for the reasons that follow in Section I.D., *infra*, Gordon's statements identifying Arnold to the police were not admissible.

        D.      Even if Gordon's out-of-court statements met the "excited utterance" criteria, they were testimonial and, therefore, inadmissible.

The U.S. Supreme Court recently ruled that out-of-court statements that are "testimonial" and made by a witness not present at trial are admissible *only* if the declarant is unavailable *and* the defendant had a prior opportunity to cross-examine. *Crawford v. Washington*, 541 U.S. 36, __, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177 (2004). According to *Crawford*, the Sixth Amendment's Confrontation Clause requires such safeguards on the use of out-of-court testimony. *Crawford*, 124 S. Ct. at 1370 ("Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation."). The Sixth Amendment "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* Accordingly, *Crawford* requires exclusion of some hearsay statements that previously were admissible under hearsay exception rules. *See* 5 Jack B. Weinstein *et al.*, *Weinstein's Federal Evidence* § 802.05[3][e] (2d ed. 2004).

While the Supreme Court did not establish a comprehensive definition for the term "testimonial," it did provide some guidance on its meaning. The Supreme Court noted that "testimony" is typically a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 1364 (internal quotation and citation omitted). "Whatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."[6] *Id.* at 1374. Testimonial statements may also include, but are not limited to, affidavits, custodial examinations, confessions, depositions, prior testimony without the benefit of cross-examination, and "statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 1364 (internal quotation and citation omitted).

---

[6]The Supreme Court noted that it used the term "interrogation" in "its colloquial, rather than any technical legal, sense." *Crawford*, 124 S. Ct. at 1365 n.4. The Supreme Court recognized that the term has "various definitions" and specifically left the definition open. *Id.*

Although the record does not establish that Gordon was "unavailable"[7] at trial, it is clear that she was not present. More to the point, the record is clear that Arnold did not have an opportunity to cross-examine Gordon concerning her out-of-court statements. Thus, it is left to this Court to determine whether Gordon's statements were "testimonial" under the rubric of *Crawford*. If so, the statements were inadmissible.

The Oxford English Dictionary ("OED") defines "testimonial" as "serving as evidence; conducive to proof;" as "verbal or documentary evidence;" and as "[s]omething serving as proof or evidence." XVII *The Oxford English Dictionary* 832 (2d ed., J. A. Simpson & E. S. C. Weiner eds., Clarendon Press 1989). The OED defines "testimony" as "[p]ersonal or documentary evidence or attestation in support of a fact or statement; hence, *any form of evidence or proof*." *Id.* at 833 (emphasis added). Similarly, Webster's defines "testimonial" as "something that serves as evidence: proof." *Webster's Third New International Dictionary of the English Language* (Unabridged) 2362 (Merriam-Webster Inc. 1993). "Testimony" is "firsthand authentication of a fact: evidence;" "something that serves as an outward sign: proof;" or "an open acknowledgment: profession." *Id.*[8]

At issue are Gordon's three out-of-court statements: (1) the 911 call, (2) the initial statement to the police at the Memphis address, and (3) the statements made to the police contemporaneously with Arnold's arrival on the scene. The *Crawford* court stated that an "accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 124 S. Ct. at 1364. On all three occasions, Gordon made the statements to government officials: the police.[9] This fact alone indicates that the statements were testimonial; further details support this conclusion.

As the *only* witness to the alleged incident, Gordon could reasonably expect that her statements would be used to prosecute Arnold. *See Id.* (testimonial statements include "statements that declarants would reasonably expect to be used prosecutorially"). Although one purpose of the 911 call may have been to secure assistance, it remains that Gordon could also reasonably expect the statements to be used in a future trial. In addition, Gordon's statements were declarations made for the purpose of "establishing or proving some fact." *Id.* (quotation and citation omitted). It would be antithetical to this entire examination were the government to suggest that Gordon made the statements for any other reason than to establish that the alleged incident occurred. Further,

---

[7]The dissent suggests that the Confrontation Clause analysis may not be available to Arnold if he was responsible for Gordon's failure to appear at his trial. The majority asserts that the facts of this case do not support the dissent's position.

Firstly, there is no evidence in the record that Arnold had any influence over or put any pressure on Gordon not to appear at Arnold's trial. The only reference to possible pressure on Gordon not to appear at Arnold's trial may be inferred from a self-serving response to a question posed by the prosecutor during Gordon's contempt hearing for her failure to appear at Arnold's trial. (J.A. at 254.) Gordon agreed that she had been under pressure from *her mother* about her involvement in Arnold's case. However, when asked whether that pressure was the reason for her failure to appear, Gordon responded, "No, no, no, it was some things going on with me that my mom didn't even really know about." (J.A. 254.) The majority finds no reason to discount Gordon's testimony and certainly no reason to impute to Arnold any possible pressure the mother may have placed on Gordon.

Secondly, although *Crawford* was decided after the trial in this case, the parties briefed the case on appeal. The prosecution had an opportunity to raise in its brief the rule of forfeiture by wrongdoing. It failed to do so. Accordingly, we need not consider it now.

[8]A review of relevant lexicographic sources is consistent with the U.S. Supreme Court's own jurisprudence on this issue. *See Crawford*, 124 S. Ct. at 1364 ("[The Confrontation Clause] applies to 'witnesses' against the accused – in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828).").

[9]The Memphis Police Communications Bureau receives 911 calls and dispatches appropriate calls to officers in the field. (J.A. at 92-93.)

Gordon's statements were evidence and proof of a matter, firsthand authentication of a fact, and open acknowledgments.

This jurisdiction has previously considered this issue. *See U.S. v. Cromer*, 389 F.3d 662 (6th Cir. 2004). In *Cromer*, which was fully briefed when *Crawford* was issued, the court considered whether the trial court's admission of testimony of a police officer witness concerning information provided by a confidential informant violated the Confrontation Clause. The court stated that the decisive inquiry should be "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Id.* at 675. The court further stated that a "statement made knowingly to the authorities that describes criminal activity is almost always testimonial." *Id.* (quotation and citation omitted). The *Cromer* court found two of the three statements at issue to be testimonial.[10] Accordingly, the court found that the trial court committed plain error by allowing the police officer's testimony and reversed the conviction. *Id.* at 679.

We see no reason for deviating from the *Cromer* holding. As in *Cromer* and as this Court has stated *supra*, Gordon could reasonably expect that her statements would be used to prosecute Arnold. Further, her statements, which were made knowingly to authorities, described criminal activity. After full consideration of the record before us and for the preceding reasons, this Court holds that Gordon's out-of-court statements were testimonial.

When out-of-court statements are testimonial, the safeguards of the Sixth Amendment's Confrontation Clause must be observed. Thus, to be admissible at trial, Gordon must have been unavailable for trial, *and* Arnold must have had a prior opportunity to cross-examine Gordon concerning the statements. *Crawford*, 124 S. Ct. at 1374. It is sufficient that Arnold did not have an opportunity to cross-examine Gordon about the statements for this Court to find that Gordon's testimonial out-of-court statements were inadmissible at trial. Therefore, the District Court committed reversible error by allowing the statements to be introduced during Arnold's trial. Accordingly, Arnold's conviction must be reversed.

II.      *The Proof Was Constitutionally Insufficient to Sustain a Conviction.*

Arnold was convicted of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (J.A. at 15.) The elements of a violation of 18 U.S.C. § 922(g)(1) are (1) the defendant had a prior felony conviction, (2) the defendant possessed a firearm, and (3) the firearm traveled in or affected interstate commerce. *U.S. v. Moreno*, 933 F.2d 362, 372 n.1 (6th Cir. 1991), *cert. denied*, 502 U.S. 895, 112 S. Ct. 265, 116 L. Ed. 2d 218 (1991) (internal quotation and citation omitted). On appeal, Arnold challenges only the possession element.

Evidence of either actual or constructive possession of a firearm is sufficient to sustain the verdict. *Id.* at 373.

> Actual possession exists when a tangible object is in the immediate possession or control of the party. Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.

*U.S. v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), *cert. denied*, 414 U.S. 866, 94 S. Ct. 54, 38 L. Ed. 2d 85 (1973). "Both actual and constructive possession may be proved by either direct or

---

[10]The third statement did not violate the Confrontation Clause because it did not contain hearsay and was presented for background information rather than for the truth of the matter asserted. *Cromer*, 389 F.3d at 676.

circumstantial evidence." *Id.* The government may prove constructive possession by presenting evidence that the person has dominion over the premises where the firearm was located. *U.S. v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998), *cert. denied*, 525 U.S. 1166, 119 S. Ct. 1085, 143 L. Ed. 2d 86 (1999) (citation omitted). However, presence where a weapon was found, without more, is insufficient to establish "knowledge, power, or intention to exercise control" over the firearm. *U.S. v. Birmley*, 529 F.2d 103, 107-08 (6th Cir. 1976).

> A.      Gordon's out-of-court statements were inadmissible and cannot be used to support conviction on the basis of actual possession.

No weapons were found on Arnold's person. Gordon's out-of-court statements were the only evidence presented at trial that Arnold actually possessed a firearm. This Court rules those statements to be inadmissible. Thus, there is no evidence to link Arnold to actual possession of any firearm and, therefore, no basis upon which a rational trier of fact could convict of actual possession.

> B.      The evidence of constructive possession is also insufficient to affirm conviction.

We now consider whether sufficient evidence existed to find Arnold guilty of constructive possession of a firearm based on the gun police recovered from the car in which Arnold was riding. Arnold was not driving the car, and the car was not registered to him. There is no indication that Arnold exercised any dominion or control over the vehicle. Further, there is no evidence on the record to suggest that Arnold even knew the gun, which was located under the passenger seat and out of plain view, was in the car. In addition, the gun was not registered to Arnold, and his fingerprints were not found on the weapon. Arnold's presence in the vicinity of the weapon is insufficient basis for conviction. *See Birmley*, 529 F.2d at 107-08. With no evidence of Arnold's knowledge of the gun's location and no evidence that he exercised dominion or control over the vehicle in which it was found, no rational trier of fact could find Arnold guilty of constructively possessing a firearm.

In light of these facts, there is insufficient evidence upon which a rational trier of fact could infer possession – either actual or constructive – of the firearm by Arnold. Accordingly, Arnold's conviction must be set aside.

> C.      Even if admissible, Gordon's statements were insufficient evidence of actual possession to affirm conviction.

Even if Gordon's statements were admissible, they were insufficient to tie the seized gun to Arnold. Gordon told the police she saw Arnold with a "black handgun." (J.A. at 127.) The police did find a black handgun in the automobile in which Arnold was a passenger. Given that fifty percent – the estimation of the police[11] – of handguns are black, the description was too generic and overly broad to overcome any rational fact finder's reasonable doubt that the weapon found was the same weapon Gordon allegedly saw Arnold wielding.

Further, this Court and others have held that uncorroborated, out-of-court statements are insufficient bases on which to sustain a conviction. *See U.S. v. Orrico*, 599 F.2d 113, 118-19 (6th Cir. 1979) (prior inconsistent statement and past recollection recorded); *State v. Webb*, 779 P.2d 1108, 1115 (Utah 1989) (out-of-court statement of non-testifying minor); *U.S. v. Bahe*, 40 F. Supp. 2d 1302, 1311 (D.N.M. 1998) (prior inconsistent statement). Although the type of hearsay evidence in the cited cases differs from the (presumed) excited utterances in the case at bar, we see no reason that they should be treated differently or accorded more evidentiary weight than the statements in

---

[11]On cross-examination, a police officer who was at the scene was questioned about how many handguns are black. (J.A. at 128.) He answered that "probably half are black and half are silver." (*Id.*)

the cited cases. *See Orrico*, 599 F.2d at 118 (adopting prior court's analysis with regard to prior inconsistent statement to past recollection recorded). The statements share the common identity of being out-of-court statements that, but for acknowledged exceptions to the otherwise standard rule of excluding hearsay evidence, would be excluded from trial.

This case is similar to a recent case decided by this Court. *McKenzie v. Smith*, 326 F.3d 721, 728 (6th Cir. 2003); *cert. denied*, 540 U.S. 1158, 124 S. Ct. 1145, 157 L. Ed. 2d 1057 (2004). McKenzie was convicted of assault with intent to commit murder based on the out-of-court statement of a minor and absent any physical evidence linking him to the crime or any eyewitness testimony. The trial court ruled that the minor victim's out-of-court statement implicating McKenzie was admissible as an excited utterance and refused to allow introduction of a subsequent contradictory statement. After a lengthy appellate history, the appellate court ruled that "given the circumstances of the child's out-of-court statement and the lack of any corroborating evidence, we hold – upon the record as a whole – that the petitioner's conviction is not supported by constitutionally sufficient evidence." *Id.* at 728.

As to the use of out-of-court statements as the basis for conviction, this Court has previously stated that

> . . . when such evidence is the only source of support for the central allegations of the charge, especially when the statements barely, if at all, meet the minimal requirements of admissibility, we do not believe that a substantial factual basis as to each element of the crime providing support for a conclusion of guilt beyond reasonable doubt has been offered by the Government.

*Orrico*, 599 F.2d at 118; *see also Bahe*, 40 F. Supp. 2d at 1309. This Court has previously noted the importance of the notions of fairness upon which our judicial system is based. Foremost among them is the "principle that man should not be allowed to be convicted on the basis of unsworn testimony." *U.S. v. Shoupe*, 548 F.2d 636, 644 (6th Cir. 1977) (citations omitted). To that end, we agree with the rule iterated in *Orrico*:

> They [out-of-court statements] may be used to corroborate evidence which otherwise would be inconclusive, may fill in gaps in the Government's reconstruction of events, or may provide valuable detail which would otherwise have been lost through lapse of memory. But the Government having offered such statements as the sole evidence of a central element of the crime charged, we hold that the Government has failed to sustain its burden of proving guilt beyond a reasonable doubt.

*Orrico*, 599 F.2d at 119.

Gordon's out-of-court statements are the only evidence linking Arnold to an alleged criminal act – possession of a firearm by a convicted felon. There was no physical evidence linking Arnold to the weapon and no eyewitness testimony. Based on the foregoing analysis, Gordon's out-of-court statements alone cannot support conviction. We conclude that Gordon's out-of-court statements were insufficient bases upon which to sustain Arnold's conviction. Accordingly, Arnold's conviction must be reversed.

III.     *Defense Counsel Should Have Been Permitted to Present an Impeachment Witness.*

During trial, defense counsel sought to introduce evidence that subsequent to Arnold's arrest Gordon had made statements indicating she had *not* seen Arnold with a gun on the day of the alleged incident. (J.A. at 66-67.) The trial court refused to admit the evidence ruling that it was hearsay for which there was no exception. (J.A. at 67-68.)

The Federal Rules of Evidence permit the introduction of impeachment testimony, not as an exception to hearsay, but as a matter of course.

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness. . . .

Fed. R. Evid. 806. On the basis of this rule, prior and subsequent inconsistent statements should be allowed to be introduced at trial to impeach the out-of-court statements of the declarant. *See Carver v. U.S.*, 164 U.S. 694, 698, 17 S. Ct. 228, 41 L. Ed. 602 (1897) ("As these declarations are necessarily ex parte, we think the defendant is entitled to the benefit of any advantage he may have lost by the want of an opportunity for cross-examination."); *see also* Fed. R. Evid. 806 advisory committee notes (1972 Proposed Rules) ("His [the out-of-court declarant's] credibility should in fairness be subject to impeachment and support as though he had in fact testified.").

This Court has misgivings about the trial court's failure to allow evidence of inconsistent statements that would tend to impeach the earlier 911 call and Gordon's statements to police. However, we need not reach a determination as to what – if any – error occurred as a result of their exclusion. Our ruling on the insufficiency of evidence against Arnold renders moot the question of error regarding the trial court's refusal to allow impeachment testimony. *See McKenzie*, 326 F.3d at 728.

## CONCLUSION

For the foregoing reasons, we hold that Gordon's out-of-court statements were inadmissible hearsay. Further, we hold that there was insufficient evidence introduced at trial to sustain Arnold's conviction. Accordingly, we **REVERSE** and **REMAND** for entry of a judgment of acquittal.

———————

**DISSENT**

———————

SUTTON, Circuit Judge. I would handle this case differently. Prior to the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), the district court allowed the Government to introduce four pieces of evidence showing that Arnold was a felon in possession of a firearm: (1) a recording of a 911 call made by Tamica Gordon indicating that Arnold had threatened her with a gun; (2) testimony by police officers regarding what Gordon told them when they arrived at the scene soon after the 911 call; (3) testimony by police officers regarding what Gordon said when Arnold suddenly arrived at the scene; and (4) the gun that police found under the passenger seat (where Arnold was sitting) of a car that arrived at the scene of the crime. All agree that the district court permissibly admitted the gun, which was found in connection with a consensual search. And virtually everyone (the parties and the court) disagrees (1) about what should have happened with the three other pieces of evidence—whether as a matter of evidence law (the excited-utterance exception to the hearsay rule) or constitutional law (the Confrontation Clause)—and (2) about whether sufficient evidence exists to convict, even assuming all four pieces of evidence were properly admitted. I have one procedural and three substantive qualms with the majority's resolution of these issues.

I.

As a matter of procedure, the majority unnecessarily reaches the most vexing issue in the case—whether the Confrontation Clause permits the introduction of 911 calls in general or this one in particular. Once one concludes that the 911 call does not satisfy the requirements of the excited-utterance exception to the hearsay rule, as the majority does, it is no more necessary to decide whether the Confrontation Clause also bars the admission of this evidence than it is to decide whether another constitutional provision does so. The reason courts traditionally interpret statutes, rules and administrative regulations before construing the Constitution is to avoid the constitutional question, not to tee it up. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring). The majority's threshold interpretation of Rule 803(2) of the Federal Rules of Evidence thus makes it quite unnecessary to decide this difficult Confrontation Clause question. That this was a case submitted on the briefs and without the benefit of oral argument doubles my conviction that we should not sidestep this canon of interpretation.

As it turns out, moreover, both the constitutional question *and* the Rule 803(2) question are unnecessary to the majority's disposition of this case. For as the court concludes in section II.C of its opinion, *supra* at 9–10, even if all of Gordon's statements were admissible, there still would be insufficient evidence to convict Arnold of being a felon in possession of a firearm. If that is true, one does not need to deal with *either* the statements' admissibility under Rule 803(2) or their admissibility under the Confrontation Clause.

II.

A.

As a matter of substance, the majority concludes that the 911 call is not an excited utterance under Rule 803(2) and concludes that Gordon's initial statement to police officers shortly after the 911 call is not an excited utterance. I cannot agree on either front.

**The 911 Call.** In concluding that the excited utterance exception does not apply to the 911 call, the majority makes three essential points. One, "'the length of time between the event and the

statement' is a critical—if not the most important—factor in determining whether the statement was spontaneous." *Supra* at 4 (quoting *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983)). Two, "the district court lacked *any* evidence with which to determine whether the 911 [call] was made before there was time to contrive or misrepresent." *Supra* at 5. Three, in the absence of evidence as to when Arnold pointed the gun at Gordon—the adrenaline-producing event—the 911 call is not an excited utterance. *Supra* at 4–5. ("[T]he record reveals no evidence as to when the alleged incident between Gordon and Arnold occurred. . . . Without such evidence, a finding that the 911 call satisfied the spontaneity element for it to be considered an 'excited utterance' was pure supposition.").

While I have some sympathy for this train of analysis, it is not consistent with our precedents. As *Haggins* explains, evidence that a brief "length of time" lapsed "between the event and the statement" may be a sufficient (and perhaps the most telling) reason for labeling a statement an excited utterance but it is not a necessary one.

> One of the most relevant factors in determining spontaneity is the length of time between the event and the statement. "Probably the most important of the many factors entering into this determination is the time factor . . . . Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in reflective thought process. *Testimony that the declarant still appeared 'nervous' or 'distraught' and that there was a reasonable basis for continuing [to be] emotional[ly] upset will often suffice*." It is important to remember [ ] that "the ultimate question is whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event." Thus, a court must take into account other factors that could affect spontaneity.

*Haggins*, 715 F.2d at 1057–58 (6th Cir. 1983) (emphasis added) (quoting McCormick's Handbook of the Law of Evidence § 297 at 705–06 (2d ed. 1972)); *id*. at 1058 ("The lapse of time between the startling event and the out-of-court statement although relevant is not dispositive in the application of Rule 803(2)."). *See also United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003) (quoting, with minor alterations, the emphasized language from *Haggins*).

Proving that immediacy is not the sole proxy for evidentiary admissibility, *Haggins* itself permitted the admission of statements by a four-year-old child who made the statements more than an hour after the incident but who was still suffering the trauma from it. Other cases from this court, as well as from other courts, have permitted the admission of statements that were made well after the startling event but well within the traumatic range of it. *See, e.g.*, *United States v. Baggett*, 251 F.3d 1087, 1090 n.1 (6th Cir. 2001) (applying the excited utterance exception to statements made several hours after the last of three separate spousal beatings over a three-day period); *United States v. Green*, No. 04-1499, 2005 U.S. App. LEXIS 4393, at *6 (6th Cir. Mar. 16, 2005) (applying the excited utterance exception to statements made three hours after the startling event); *United States v. Tabaja*, No. 02-2359, 2004 U.S. App. LEXIS 3596, at *14–15 (6th Cir. Feb. 23, 2004) ("While the record does not clearly establish the exact time interval between the startling event and the contested statement, it does demonstrate that this interval, at its outermost, could not have exceeded eleven hours. . . . Even assuming that the time interval . . . was eleven hours and long enough for [declarant] to have contrived that statement, it was, nevertheless, reasonable to conclude that [declarant's] excited emotional state at the time that she made that statement persisted."); *see also United States v. Cruz*, 156 F.3d 22, 30 (1st Cir. 1998) (applying the excited utterance exception to statements made at 8 a.m. when spousal beating ceased at 4 a.m.); *Morgan v. Foretich*, 846 F.2d 941, 947 (4th Cir. 1988) (applying the excited utterance exception to statements made three hours after the startling event).

Nor may the district court fairly be faulted for its efforts to deal with the absence of precise evidence regarding when Arnold wielded the gun at Gordon. For one, Arnold permissibly exercised his Fifth Amendment right not to discuss the event and Gordon, perhaps with prompting from Arnold (more on that later), was not available to testify about the event. For another, the district court did all that could be asked of it in trying to ascertain the timing of the assault in the absence of this more direct evidence. The court listened to the tape of the 911 call five times, JA 41, 49, 52, to determine whether Gordon's language itself established when the startling event occurred and clearly determined that there was some contemporaneity between the event and the call—at one point determining that Gordon stated "he's fixing to shoot me," not that he "was fixing to shoot me," JA 52. And while listening to the tape, the court repeatedly noted that Gordon seemed "very excited." JA 50, 52. The court then reasoned as follows:

> So I think what we seem to have here is an event that occurred, I must say, slightly less than immediately thereafter or slightly more than immediately after. It was a little more than immediate. . . . The question is then was it sufficiently close in time for her ability to misrepresent facts to be overridden by the excitement of what had occurred. And the 911 tape, while not perfect, in terms of the information submitted to the court in terms of timing, when listened to appears to support a finding and, it does support a finding that the three elements are present. . . . The second thing is that the statement that she made appears to have been made before there was time to contrive or misrepresent. That appears to be the case. She appears excited, clearly under the stress and the influence of the event that she had undergone. The record is less than perfect in this case, but the tape itself strongly supports a finding in favor of the government.

JA 63–64.

One other aspect of the 911 tape supports the district court's conclusion that it happened immediately after Arnold threatened Gordon. After she states that "he's fixing to shoot me," she adds: "so I got in my car and [inaudible] left, and I went around the corner from the house." On the basis of this language, it is quite reasonable to infer that Gordon placed the call immediately after Arnold's threat prompted her to leave the house and that she did so from a car parked around the corner from the house. The dispatcher, notably, seems to have reached the same conclusion: "[The police] will be over there as soon as they can, ok? You just kind of be watching for him, ok?"

Notwithstanding this evidence, if our court demanded a specific finding as to the moment of the startling event and the lapse of time between the startling event and the out-of-court statement, I might support the majority's assessment of this issue. Yet we have held that the exception may apply based solely on "testimony that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing [to be] emotional[ly] upset," *Haggins*, 715 F.2d at 1058; *Schreane*, 331 F.3d at 564, a conclusion that eliminates an unyielding requirement of a timeline showing precisely how long ago the threatening event occurred or precisely how much time there was for contrivance. The district court made this exact finding, a finding supported by evidence that, in the words of *Haggins*, "will often suffice." 715 F.2d at 1058. Until the en banc court sees fit to modify this precedent, which indeed may be appropriate, I would adhere to it and thus would hold that the district court did not abuse its discretion in concluding that Gordon's 911 call was an excited utterance. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) ("[A]buse of discretion is the proper standard of review of a district court's evidentiary rulings."); *United States v. Beverly*, 369 F.3d 516, 540 (6th Cir. 2004) (applying abuse of discretion standard of review to excited utterance exception); *Baggett*, 251 F.3d at 1090 n.1 (same).

Nor, contrary to the majority's conclusion, *supra* at 4 n.4, does it matter at this point whether the 911 tape was admitted without proper foundation. As the Federal Rules of Evidence themselves make clear, Arnold may waive this objection, *see* Fed. R. Evid. 103(a), which he in fact did.

**Gordon's statement to officers soon after the 911 call.** The majority next concludes that the district court erred in finding that Gordon's statement to officers soon after they responded to the 911 call constituted an excited utterance. I again disagree. An additional five or six minutes (JA 114), not fifteen minutes, *see supra* at 5, lapsed between the 911 call and the officers' arrival on the scene. And the district court permissibly exercised its discretion under our precedents in finding that Gordon was still very excited and crying when the officers arrived and in concluding that her statement still constituted an excited utterance. *See* JA 79–80 ("[T]he witness's ability to contrive or misrepresent appears to not exist. She appears to, based on the officer's testimony, to be overwhelmed by the facts and circumstances, fearful as a result of the incident, highly excited, very emotional at the time. She has been exposed to an event which is startling and reasonably would cause anybody to have great nervous excitement, and she did respond in that way, and there does not appear to have been time to contrive or misrepresent."); *id.* at 80–81 ("The degree of excitement by the witness appears to be really beyond serious question, . . . so all we have left is the statement must be made before there is time for contrivance or misrepresentation, and the court finds that there is sufficient evidence to support that determination.").

**Gordon's statement to officers after Arnold suddenly pulled up next to the police car.** Within a minute of the officers' arrival, a car with Arnold in it pulled up next to the police car, at which point Gordon made the last of her statements admitted as excited utterances: "That's him, that's the guy who pulled a gun on me, Joseph Arnold, that's him." JA 115. The district court found this statement admissible as part of the same emotional trauma that captured Gordon's overall statements to responding officers. On top of that, the unexpected arrival of the defendant at the scene of the crime could itself suffice to trigger a startling event and excited verbal response. *Cf. Beverly*, 369 F.3d at 539–40 (holding that showing a photograph of the declarant's husband robbing a bank was a startling event sufficient to evoke an excited utterance); *United States v. Scott*, No. 02-1139, 2003 U.S. App. LEXIS 14091, at *12–13 (6th Cir. July 10, 2003) (upholding the introduction of excited utterance by police officer in the course of chasing suspect on foot); *United States v. Taylor*, No. 92-5120, 1992 U.S. App. LEXIS 29048, at *3 (6th Cir. Nov. 5, 1992) (upholding the introduction of excited utterance made when armed officers entered home to execute a search warrant). Either way, whether as part of Gordon's spontaneous narrative to responding officers or as a reaction to Arnold's sudden arrival on the scene, I agree with the majority that the district court did not abuse its discretion under our precedents in concluding that this last statement could be admitted under Rule 803(2).

B.

As another matter of substance, I would handle the Confrontation Clause claim differently. In addressing this issue, the district court did so in the context of a pre-*Crawford* world. Quite understandably then and quite wrongly now, it reasoned that the applicability of a modern hearsay exception (here, excited utterances) freed the evidence from challenge under the Confrontation Clause in accordance with *Ohio v. Roberts*, 448 U.S. 56 (1980). As the majority correctly recognizes, that is no longer an accurate method of analysis. *See Crawford*, 541 U.S. at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence."). Under *Crawford*, when the prosecution seeks to introduce "testimonial" statements against a criminal defendant, when in the words of the Sixth Amendment the "accused" is being subject to "witnesses against him," U.S. Const. amend. VI, the defendant generally will have a right to confront those witnesses—without regard to what the modern-day Federal (or State) Rules of Evidence have to say about the matter. *But see Crawford*, 541 U.S. at 56 n.6 (acknowledging that hearsay exception for dying declarations may present an

exception to the Confrontation Clause "on historical grounds" but if so "it is *sui generis*"); *cf. id.* at 58 n.8 (observing that any tradition of admitting spontaneous declarations applied at most to statements made "immediat[ely] upon the hurt received") (quoting *Thompson v. Trevanion*, Skin. 402, 90 Eng. Rep. 179 (K.B. 1694)). In re-calibrating the Confrontation Clause analysis, however, *Crawford* does not alter the forfeiture-by-wrongdoing exception to the Clause, which applies when the criminal defendant is responsible for the witness's unavailability. *See* 541 U.S. at 62 (accepting the rule as an "exception to the Confrontation Clause" on "essentially equitable grounds").

*Crawford*, then, prompts two inquiries that the parties had no reason to debate below, that the district court had no reason to consider and that the district court had no reason to make any factfindings about: Were Gordon's three statements "testimonial" in nature? And even if the statements were testimonial, was Arnold responsible for Gordon's unavailability? Let me consider each in turn.

1.

**The 911 Call.** My first objection to the majority's analysis is its conclusion that all 911 calls are testimonial. In *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), the court suggested the following test for ascertaining whether a statement is testimonial or not: "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Id*. at 675. I am hard pressed to understand how a "reasonable person" test prompts the conclusion that *all* 911 calls are testimonial. Surely a victim's fear-induced statement to a 911 dispatcher that he is being chased through the house by an assailant is nothing more than a fervent cry for help, not a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" in a court of law. *Crawford*, 541 U.S. at 51. *See Leavitt v. Arave*, 383 F.3d 809, 830 n.22 (9th Cir. 2004) (holding that a victim's fearful statements to 911 dispatchers and responding officers were not testimonial); *People v. Conyers*, 777 N.Y.S.2d 274, 276 (N.Y. Sup. 2004) (holding that 911 calls were not testimonial because it was clear to the court, "having heard the panicked and terrified scream of Ms. Conyers[], that her intention in placing the 911 calls was to stop the assault in progress and not to consider the legal ramifications of herself as a witness in a future proceeding"); *Pitts v. State*, No. A04A1621, 2005 Ga. App. LEXIS 50, at *12 (Ga. Ct. App. Jan. 24, 2005) (holding that victim's statements on 911 call were not testimonial because they were made while the incident was ongoing, because the purpose was to stop a crime and because the statements were made without premeditation or afterthought); *State v. Wright*, 686 N.W.2d 295, 302 (Minn. Ct. App. 2004), *review granted*, 2004 Minn. LEXIS 750 (Minn. Nov. 23, 2004) (holding that 911 call "moments after the criminal offense and under the stress of the event" was not testimonial); *People v. Corella*, 18 Cal. Rptr. 3d 770, 776 (Cal. Ct. App. 2004) (same); *see generally* Akhil Reed Amar, *Confrontation Clause First Principles: A Reply to Professor Friedman*, 86 Geo. L.J. 1045, 1045 (1998) (The Confrontation "Clause encompasses only those 'witnesses' who testify either by taking the stand in person or via government-prepared affidavits, depositions, videotapes, and the like.").

Doubtless, judges are poorly equipped to play arm-chair psychologists or crime-trauma experts (and perhaps appellate judges are even more poorly equipped to do so). But it does not seem unduly speculative to conclude that the state of mind of few 911 callers faced with an imminent threat of violence will bear the collected features that the Court has ascribed to "testimonial" evidence—namely, a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" in a court of law. *Crawford*, 541 U.S. at 51. One can only admire the presence of mind of a 911 caller who feels that way. At all events, that is not what we have here: The district court found that Gordon was "upset to the point that she was having difficulty speaking." *Supra* at 2.

Nor do statements made by individuals who are overcome by the threat that confronts them bear apt analogy to the types of statements that the Court has deemed to be testimonial in nature.

Such emergency calls can hardly be said invariably to amount to "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Crawford*, 541 U.S. at 51–52 (quotations and citations omitted).

The majority does not overcome these objections by invoking modern-day dictionary definitions of "testimonial," *supra* at 7, that equate "testimonial" with "evidence." If the only question in a Confrontation Clause case is whether the government wishes to introduce "evidence," there will be little suspense as to whether the Clause applies and great suspense as to what it means to make a *non-testimonial* statement. Neither do I understand how this inquiry could turn on whether the 911 caller is "the *only* witness to the alleged incident." *Supra* at 7. As in this case, fear frequently will be the emotion that makes it difficult, if not impossible, to say that the 911 caller in a criminal case is making a "solemn declaration or affirmation." *Crawford*, 541 U.S. at 51. And that fear generally will increase rather than diminish when the witness is alone. To the extent the number of witnesses to a crime affects this inquiry at all, it seems to me that an isolated individual is more apt to make a non-testimonial statement than an accompanied one.

It is one thing, I realize, to disagree with your colleagues' assessment of an issue; it is quite another to propose an alternative, which in this instance proves that it is far easier to write a Constitution than to interpret one. In my view, this 911 call, and indeed most 911 calls, should be treated as non-testimonial. An emergency call does not naturally satisfy the Court's definitions of "testimonial" evidence—either because it is not a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" in a court of law, *id.*, or because it is not a statement that "declarants would reasonably expect to be used prosecutorially," *id.* at 51–52. As in this case, a 911 call generally will be a plea for help, not an effort to establish a record for future prosecution. A 911 call represents a backward-looking response to an emergency that has already occurred or a contemporaneous response to an emergency that is occurring, not a forward-looking statement about a criminal prosecution that may or may not occur. Such calls also bear poor analogies to the kinds of testimonial statements that the Court has said will traditionally qualify—"affidavits, depositions, prior testimony, or confessions," *id.* at 51–52. Add to these considerations the following realities— that the call is frequently made in the context of real or perceived emergencies, that the call is frequently answered by operators who are not employed by law enforcement and that when the call is answered by law enforcement personnel that fact is by no means clear to the caller—and it seems to me that the 911 call that qualifies as testimonial evidence will be the exception, not the rule.

While this approach likely will mean that most 911 calls will be admissible, it does not mean that all of them will be admitted. There may well be situations where the 911 call is not far removed from a deliberative statement to investigating officers or where, to borrow a phrase from Professors Friedman and McCormack, it amounts to nothing less than "dial-in testimony." Richard D. Friedman & Bridget McCormack, *Dial-In Testimony*, 150 U. Pa. L. Rev. 1171 (2002). District court judges are well equipped to determine on a case-by-case basis whether such an exception ought to apply, and we are well equipped to ensure that in the general run of cases "dial-in testimony" is not being admitted. To the extent there is doubt in this case about whether Gordon's 911 call should be testimonial, I would have preferred to give the district court an opportunity, so far denied to it, to consider the admissibility of the call in the aftermath of *Crawford*.

In considering this issue, I cannot resist commenting on the nexus between the "excited utterance" inquiry and the "testimonial" inquiry. When a district court finds that a 911 call "relate[s] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"—when in other words the trial judge finds that the call qualifies as an excited utterance under Rule 803(2) of the Federal Rules of Evidence—it often would seem to be the

case that the call is not testimonial in nature. It is very difficult to imagine a "solemn" excited utterance or even a semi-solemn excited utterance. Any statement that takes on the qualities that the Court has ascribed to the definition of testimonial evidence (a "solemn declaration . . . ," *Crawford*, 541 U.S. at 51) or to agreed-upon forms of testimonial evidence ("affidavits, depositions, prior testimony, or confessions," *id.* at 51–52) would seem to depart from the prerequisites for establishing an excited utterance. To respect the one set of requirements would seem to disrespect the other. In the end, the number of "solemn" statements that also happen to "relate to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" may be something approaching a null set.

While this additional consideration is in tension with *Crawford*'s rejection of the *Roberts* regime, it is not clear that *Crawford* makes the inquiry a forbidden one. True, *Roberts* linked the Confrontation Clause inquiry to whether the testimony was eligible for admission under an accepted hearsay exception. True also, *Crawford* broke that linkage in concluding that "we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence." 541 U.S. at 61. But in reaching that conclusion, the Court did so only "[w]here testimonial statements are involved." *Id.* It never addressed—it had no reason to address—whether the Rules of Evidence could offer insight on whether a statement was "testimonial" or not. Because the very qualities that make a statement an "excited utterance" seem distantly removed from the qualities of "solemn declarations" or statements that "declarants would reasonably expect to be used prosecutorially," it is difficult to believe that the Court meant to preclude lower courts from considering whether the Rule 803(2) factfindings and conclusion bear on whether a statement is testimonial or not. Nor, in contrast to *Roberts*, will the Rule 803(2) analysis invariably be conclusive. District courts may admit excited utterances under Rule 803(2) that appellate courts should uphold under an abuse-of-discretion standard but that they should not uphold under a Confrontation Clause challenge and the de novo review that accompanies it. In this case, at any rate, I would conclude that the 911 call was not testimonial or at a minimum I would remand the issue to the district court for its consideration in the first instance in the aftermath of *Crawford*.

**Gordon's two other statements—(1) to officers immediately after the 911 call and (2) to officers after Arnold suddenly pulled up next to the police car in which Gordon was sitting.** Statements to investigating officers represent a step removed from a 911 call; they will be made consciously to police officers; and in my view they frequently will be testimonial in nature. In contrast to 911 calls, they present a more meaningful analogy to the kinds of statements that the Court has held generally will be testimonial in nature. *See, e.g.*, *United States v. Neilsen*, 371 F.3d 574, 581 (9th Cir. 2004) (finding statement to an officer during execution of search warrant testimonial); *Moody v. State*, 594 S.E.2d 350, 353–54 (Ga. 2004) (finding victim's statement to investigating officer "shortly after" event testimonial); *State v. Bell*, 603 S.E.2d 93, 116 (N.C. 2004) (finding statement to investigating officer testimonial because it "was made to further [the officer's] investigation of the crime"); *Lee v. State*, 143 S.W.3d 565 (Tex. Ct. App. 2004) (finding statement to officer at scene of incident after declarant was arrested testimonial).

But I would not go so far as to say, as the majority does, *supra* at 7, that the fact that a statement was made to government officials *by itself* indicates that the statements were testimonial. That will not always be the case. *See Leavitt*, 383 F.3d at 830 n.22 (9th Cir. 2004) (holding that a victim's fearful statements to 911 dispatchers and responding officers were not testimonial); *People v. Newland*, 775 N.Y.S.2d 308, 309 (N.Y. App. Div. 2004) (finding nontestimonial a brief, informal remark made to an officer conducting a field investigation because no structured police questioning occurred and the interaction bore no resemblance to civil-law abuses against which the Confrontation Clause was written to protect); *Hammon v. State*, 809 N.E.2d 945, 952 (Ind. Ct. App. 2004) ("[W]hen police arrive at the scene of an incident in response to a request for assistance and begin informally questioning those nearby immediately thereafter in order to determine what has happened, statements given in response thereto are not 'testimonial.' Whatever else police 'interrogation' might be, we do

not believe that word applies to preliminary investigatory questions asked at the scene of a crime shortly after it has occurred.").

In this instance, the factfindings made by the district court in connection with its Rule 803(2) rulings suggest that these two statements represent the exception that proves the rule. In the district court's view, Gordon was "overwhelmed by the facts and circumstances, fearful as a result of the incident, highly excited, very emotional at the time." JA 79–80. While most statements made directly and consciously to investigating officers will be testimonial, the reality that Gordon was still overcome by the threatened assault in this case suggests that they were not "solemn declarations" or statements that "declarants would reasonably expect to be used prosecutorially." I thus either would uphold the admission of both statements as non-testimonial in nature or remand the case to the district court to consider the question in the first instance.

2.

In addition to the question whether these statements were non-testimonial in nature, *Crawford* heightens the importance of another exception to the Confrontation Clause—the rule of forfeiture by wrongdoing. Under this doctrine, a defendant may not sustain a Confrontation Clause objection if the defendant is responsible for the declarant's unavailability at trial. As we have explained:

> Employing either a concept of implicit waiver of confrontation or the principle that a person should not profit by his own wrong, English and American courts have consistently relaxed the hearsay rule when the defendant wrongfully causes the witness's unavailability. The theory of the cases appears to be that the disclosure of relevant information at a public trial is a paramount interest, and any significant interference with that interest, other than by exercising a legal right to object at the trial itself, is a wrongful act. Wrongful conduct obviously includes the use of force and threats, but it has also been held to include persuasion and control by a defendant, the wrongful nondisclosure of information, and a defendant's direction to a witness to exercise the fifth amendment privilege.

*Steele v. Taylor*, 684 F.2d 1193, 1201 (6th Cir. 1982) (collecting cases, including (1) *Reynolds v. United States*, 98 U.S. 145 (1879); (2) *Lord Morley's Case*, 6 State Trials 770 (1666); (3) *Harrison's Case*, 12 State Trials 851 (1692); and (4) *Regina v. Scaife*, 117 Rev. Rep. 1271 (Q.B. 1851)); *see also* Fed. R. Evid. 804(b)(6) (allowing "a statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness") (enacted after *Steele*).

Our court recently confirmed that the forfeiture doctrine remains alive and well in the aftermath of *Crawford*, concluding that it applies even if the defendant's wrongdoing was not motivated by an effort to keep an individual off of the witness stand.

> There is no requirement that a defendant who prevents a witness from testifying against him through his own wrongdoing only forfeits his right to confront the witness where, in procuring the witness's unavailability, he intended to prevent the witness from testifying. Though the Federal Rules of Evidence may contain such a requirement, *see* Fed. R. Evid. 804(b)(6), the right secured by the Sixth Amendment does not depend on, in the recent words of the Supreme Court, "the vagaries of the Rules of Evidence." *Crawford*, 124 S. Ct. at 1370. The Supreme Court's recent affirmation of the "essentially equitable grounds" for the rule of forfeiture strongly suggests that the rule's applicability does not hinge on the wrongdoer's motive. The Defendant, regardless of whether he intended to prevent the witness from testifying against him or not, would benefit through his own wrongdoing if such a witness's

statements could not be used against him, which the rule of forfeiture, based on principles of equity, does not permit.

*United States v. Garcia-Meza*, 403 F.3d 364, 370–71 (6th Cir. 2005).

At Gordon's contempt-of-court hearing for failing to appear to testify, the government introduced evidence suggesting that Gordon's mother, who was Arnold's girlfriend at the time of the assault, pressured Gordon not to testify against Arnold. During the hearing, the government posed the following question: "Ms. Gordon, you have been getting a little bit of pressure prior to the trial in November from family members about—specifically your mother about being involved in all this, is that fair to say?" JA 254. In response, Gordon answered yes. While Gordon later contended that this pressure did not explain her decision not to call the prosecutor's office to report her unavailability to testify, one need not be an incorrigible cynic to question whether Gordon's mother (with Arnold's support) played a role in her daughter's decision not to testify at Arnold's trial. *See United States v. Mayes*, 512 F.2d 637, 651 (6th Cir. 1975) (holding that the defendant procured the declarant's unavailability when his counsel advised the declarant to invoke his Fifth Amendment right against self-incrimination and there was evidence that the attorney had the interests of the defendant, not the declarant, in mind and concluding that, despite any direct evidence of defendant's own involvement, it "must assume defendant concurred" in his counsel's actions); *see also United States v. Potamitis*, 739 F.2d 784, 788–89 (2d Cir. 1984) (applying forfeiture doctrine when defendant's father intimidated two witnesses into not appearing for trial).

Nor can the significance of this exception to the Confrontation Clause be overstated in the aftermath of *Crawford*. A significant percentage of Confrontation Clause disputes have arisen, and sadly are apt to continue to arise, in the context of domestic-abuse and other domestic-disturbance situations, where family members who have prompted a police investigation (usually through a 911 call) later become "unavailable" to testify. In these situations, there is a palpable risk that the same threats of domestic violence that prompted the 911 call were later used to dissuade a family member from testifying. *See also Friedman & McCormack, supra*, at 1174–75; Richard D. Friedman, *Confrontation and the Definition of Chutzpa*, 31 Isr. L. Rev. 506 (1997).

Under these circumstances and on this scant record, I would remand the case to the district court to hold a hearing on whether Arnold impermissibly played a role in Gordon's decision not to testify. Neither the district court nor the parties in the first instance had a reason to consider the applicability of this exception to the Confrontation Clause. *See Reynolds*, 98 U.S. at 145 ("[T]he question [of wrongfully procuring witness unavailability] becomes practically one of fact, to be settled as a preliminary to the admission of secondary evidence."); *Steele*, 684 F.2d at 1201 (citing *Reynolds* for this proposition). They should be given that opportunity now.

### C.

As a final matter of substance, I cannot agree with the majority's sufficiency-of-the evidence ruling. The majority concludes alternatively that all of this is irrelevant because even if all three of Gordon's statements were admissible, there still would be insufficient evidence to sustain Arnold's conviction in this case and accordingly any re-prosecution is barred by double jeopardy. *See supra* section II.C. This conclusion has no precedent or policy to recommend it.

Arnold challenges the sufficiency of the evidence of just one element of the felon-in-possession-of-a-firearm charge: Did he possess a firearm? If we assume in addressing this argument that all four pieces of evidence were properly admitted, as we must, then a jury plainly could conclude beyond a reasonable doubt that he possessed the gun. After all, Gordon told a 911 caller that Arnold threatened her with a gun; she told the police after they arrived at the crime scene that Arnold "pulled a gun on her" and threatened to kill her with a black handgun; when Arnold

suddenly returned to the scene of the crime in a car, Gordon pointed to him and told the police "That's him, that's the guy who pulled a gun on me, Joseph Arnold, that's him," JA 115; then the police found a black handgun under the passenger seat of the car where Arnold was sitting.

Even if virtually every individual in America owned the same type of black handgun found under Arnold's car seat, surely this evidence cumulatively would suffice to show that Arnold possessed a handgun. The first statement, if properly admitted, should suffice by itself to sustain this element of the crime. The second statement and the recovery of the handgun under Arnold's car seat remove any conceivable doubt about the sufficiency of the evidence. And the third statement ("That's him, that's the guy who pulled a gun on me, Joseph Arnold, that's him.") leaves me wondering what else there is to say.

There is one more thing to say: Precedent offers no refuge for the majority's ruling and specifically for its across-the-board conclusion that "uncorroborated, out-of-court statements are insufficient bases on which to sustain a conviction." *Supra* at 9. If a district court permissibly admits hearsay evidence, that evidence of course may provide the requisite evidence to convict. Not always, of course, but assuredly in some cases, if not most cases. Otherwise, what is the point of admitting it? Just to corroborate the *non-hearsay* evidence? And surely when three pieces of hearsay evidence, backed up by one piece of non-hearsay evidence, all point unconditionally in the same direction, that evidence cumulatively may support the conviction.

The quartet of cases upon which the majority relies—*United States v. Orrico*, 599 F.2d 113 (6th Cir. 1979), *McKenzie v. Smith*, 326 F.3d 721 (6th Cir. 2003), *State v. Webb*, 779 P.2d 1108 (Utah 1989), and *United States v. Bahe*, 40 F. Supp. 2d 1302 (D.N.M. 1998)—say nothing to the contrary. None of them involves four pieces of corroborating evidence; none of them involves remotely similar facts; and none of them declares that "uncorroborated, out-of-court statements are insufficient bases on which to sustain a conviction." *Supra* at 9.

*Orrico* held that "under the circumstances of this case," 599 F.2d at 119, statements admitted as a past recollection recorded, which "barely, if at all, met the minimal requirements of admissibility," *id*. at 118, were not sufficient to sustain a conviction. While the majority "see[s] no reason that [excited utterances] should be treated differently" from statements admitted as past recollections recorded, *supra* at 10, it offers no reason why they should be treated the same, and above all it offers no reason why a conviction supported by four pieces of evidence (hearsay and non-hearsay alike) can be meaningfully compared to *Orrico*.

*McKenzie* held that "given the circumstances" of the excited utterance admitted against the defendant, 326 F.3d at 728, the conviction was not supported by sufficient evidence. Those circumstances, however, have no identifiable parallel to this case. The excited utterance in *McKenzie* was that of a declarant not competent to testify, who at the time of the statement was three years old, "did not appear normal psychologically" and suffered from an "acutely deranged abnormal condition." *Id*. *Webb* likewise held that a one-year-old's out of court statements ("Ow, bum" and "Ow, bum daddy") did not alone prove the mens rea required to establish aggravated sexual abuse. 779 P.2d at 1115.

And in *Bahe*, the court cautioned that it "has no intention of adopting a per se rule regarding the sufficiency of a prior inconsistent statement to support a conviction, nor will this Court conclude that evidence in this case is insufficient based on a rigid application of such a rule." 40 F. Supp. 2d at 1310–11. It then concluded only that the declarant's prior inconsistent statement (that the defendant had abused her) provided insufficient evidence to convict because it conflicted with her live, in-court testimony (that the defendant had not abused her). *Id.* at 1311.

In the final analysis, I would hold that a rational jury could conclude that uncontradicted evidence showing that the defendant pointed a gun at the victim, that the defendant was identified as the man who pointed the gun and that a gun was found under the defendant's car seat suffices to establish that the defendant was guilty of being a felon in possession of a gun.